174 P.3d 298

**Merwyn C. DAVIS, Trustee under the Merwyn C. Davis Trust dated July 27, 1981, Plaintiff/Counter–Defendant/Appellee,**

and

**Chino Grande, L.L.C., Plaintiff/Intervenor/Counter-Defendant/Appellee,**

v.

**AGUA SIERRA RESOURCES, L.L.C., a Texas limited liability company, Defendant/Counter–Claimant/Appellant,**

and

**Red Deer Cattle, Inc., a Texas corporation; CJ Partners, a Nevada limited partnership; and Seibert Family Limited Partnership, a Nevada limited partnership, Defendants/Appellants.**

No. 1 CA–CV 06–0806.

Court of Appeals of Arizona, Division 1, Department D.

Jan. 15, 2008.

Reconsideration Denied, May 7, 2008.

Robert S. Lynch & Associates By Robert S. Lynch, Andrea L. Gonzales, Phoenix, Attorneys for Appellees.

Anna Young, P.L.L.C. By Anna Young, Prescott, Co–Counsel for Appellees.

Gallagher & Kennedy, P.A. By Michael R. Ross, Jennifer Ratcliff, Phoenix, Attorneys for Appellants.

Meyer Hendricks PLLC By Tom Galbraith, Phoenix, Co–Counsel for Appellants.

JOHNSEN, Judge.

¶ 1 Arizona law imposes certain restrictions on a property owner's right to extract "percolating" groundwater and transport it for use elsewhere. Our issue is whether the law permits an owner that conveys real property to another to reserve for itself whatever commercial groundwater rights might be associated with the property. We hold the law permits such a reservation and reverse the superior court's order to the contrary.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 The reservation we review encompasses commercial water rights associated with a portion of the CF Ranch ("CF Ranch"), located in the Big Chino groundwater sub-basin in Yavapai County. We start by setting out in some detail a string of transactions by which interests in or relating to the ranch were conveyed. The significant fact, however, is that each transaction provided that "commercial water rights" would be reserved and not conveyed.

¶ 3 On February 11, 1981, Chino Ranch, Inc. ("Chino Ranch") conveyed "certain real property included in and commonly referred to as the CF Ranch" to Red Deer Cattle, Inc. ("Red Deer") by warranty deed (the "1981 Deed"). The 1981 Deed excluded from the conveyance all commercial water rights associated with the property.[1]

¶ 4 By warranty deed dated April 2, 1984 (the "1984 Deed"), Red Deer in turn conveyed the CF Ranch to Merwyn C. Davis,

Trustee under the Merwyn C. Davis Trust dated July 27, 1981 ("Davis"), who paid $1,421,000 for the property. In the conveyance, Red Deer reserved to itself the commercial water rights associated with the ranch. The 1984 Deed expressly encompassed:

[a]ll right, title and interest of [Red Deer] in and to [the CF Ranch] ... excluding therefrom and reserving to [Red Deer] all gas, oil and mineral rights and all commercial water rights and waters incident and appurtenant to and within the real property as reserved and as conveyed hereby to [Davis], together with the rights to develop such minerals and waters and market and transport the same from the premises hereby conveyed; PROVIDED HOWEVER, such exclusion and reservation of commercial water rights shall not preclude [Davis], and those claiming under [Davis], from obtaining and using water for ranch, livestock and domestic and agriculturally related purposes.

¶ 5 Chino Ranch later merged into Red Deer, which, on October 30, 1997, conveyed to the Seibert Family Limited Partnership "an undivided one-half ... ownership interest in and to all previously reserved 'commercial water rights' owned by Grantor," including the commercial water rights associated with the CF Ranch.

¶ 6 The Seibert Family Limited Partnership then conveyed to CJ Partners "an undivided one-half ... ownership interest" in those commercial water rights. Finally, in May 1998, Red Deer and CJ Partners, the two members of Agua Sierra Resources, L.L.C. ("Agua Sierra"), each conveyed to Agua Sierra its respective one-half interest in the water rights.[2]

¶ 7 Prior to any of the conveyances described above, the City of Prescott ("City") was looking to tap groundwater in the area to serve the City's increasing population. According to City Council minutes, the City

---

1. The deed described the conveyed property and then simply stated, "excluding therefrom all mineral and oil rights and all commercial water rights."

2. On July 6, 1999, Chino Ranch executed a quit claim deed pertaining to CF Ranch that sought to

"correct and supplement the record title previously conveyed apparently incompletely by [the 1984 Deed]." The quit claim deed contained the same reservation language as found in the 1984 Deed.

had expressed interest as early as 1976 in acquiring groundwater from the Big Chino Valley to supplement its municipal water supply. In 1988, Davis, by then the owner of the CF Ranch, granted the City an option to purchase property that included the CF Ranch and all appurtenant water rights. The option price was $3,000; the price to exercise the option was to be $15 million. The City, however, did not exercise the option, and it expired in 1992.

¶ 8 On April 22, 2003, Davis granted the City a second option to purchase property including the CF Ranch and all water rights appurtenant to it. An addendum to the option agreement expressly recognized that "Davis is unsure of the status of the water rights located on" the optioned property and that his "ownership interest in said water rights may be unclear, incomplete, inappropriately described, or subject to challenge."

¶ 9 The price of the second option was $250,000; the purchase price of the property and associated water rights was set at $30 million. The bulk of the property's value lay in its associated groundwater rights. An appraisal estimated the market value of the property to be $23 million. The appraiser noted that the "most probable current and future use of the water resources present on the subject property" was "for transportation to the City of Prescott." Assuming that 12,000 acre/feet of groundwater a year could be transported from the property for use by the City, the appraiser concluded that $18 million to $21 million of the total value of the property was attributable to its water resources.

¶ 10 Recognizing that the reservations of commercial water rights recounted above clouded the ownership of water rights associated with the CF Ranch, the City, by letter dated March 5, 2004, asked Davis to seek to purchase those rights so the City could acquire them when it exercised its option to purchase the property. Accordingly, by letter dated April 29, 2004, Davis offered to pay Agua Sierra $300,000 for the commercial water rights associated with the CF Ranch.

Agua Sierra declined Davis's offer, and the City permitted its purchase option to expire.

¶ 11 Unable to negotiate an agreement, on August 24, 2004, Davis filed a complaint against Agua Sierra, Red Deer, CJ Partners and the Seibert Family Limited Partnership (collectively, "Appellants"), seeking a judgment invalidating the commercial water rights reservations associated with the CF Ranch. Appellants answered the complaint and asserted several affirmative defenses. Agua Sierra also filed a counterclaim seeking a judgment declaring its commercial water rights reservation to be valid and a judgment quieting title in its favor to all commercial water rights associated with the CF Ranch. Alternatively, Agua Sierra sought rescission of the 1984 conveyance of the CF Ranch to Davis.[3]

¶ 12 Davis filed a motion for summary judgment, contending that Arizona law "does not permit the creation of a future water right," "does not permit a water right to be severed from land," and "does not recognize a water right for 'commercial purposes.'" Appellants responded and filed a cross-motion for summary judgment, arguing that the reservation was valid and that the court should enter a declaratory judgment and an order quieting title in Agua Sierra's favor.

¶ 13 After hearing oral argument, the superior court granted summary judgment in favor of Davis. In finding the reservation invalid, the court relied in large part on cases that hold groundwater is not appropriable but is instead subject to the doctrine of reasonable use. *See In re the Gen. Adjudication of All Rights to Use Water in the Gila River Sys. & Source*, 198 Ariz. 330, 9 P.3d 1069 (2000) ("*Gila River IV*"); *Bristor v. Cheatham*, 75 Ariz. 227, 255 P.2d 173 (1953). The superior court concluded, "as a matter of law ... Arizona does not recognize the reservation of commercial water rights or the right to develop commercial water rights as reserved in the deeds to the property in this case." The court also ruled that because "the case law underlying that legal determination has been in existence since 1953 when

---

**3.** On May 2, 2005, Red Deer assigned Agua Sierra all equitable claims or interests that it may have had relating to the CF Ranch.

*Bristor* was determined," Agua Sierra was not entitled to a rescission of the 1984 Deed. Appellants timely appealed the judgment.[4]

## DISCUSSION

### A. Standard of Review.

¶ 14 In reviewing summary judgment, we determine de novo whether genuine issues of material fact exist and whether the trial court correctly applied the law. *United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 140, ¶ 26, 128 P.3d 756, 763 (App.2006). "[W]e view the facts and evidence in a light most favorable to the party against whom summary judgment was granted and draw all reasonable inferences in favor of that party." *AROK Constr. Co. v. Indian Constr. Servs.*, 174 Ariz. 291, 293, 848 P.2d 870, 872 (App. 1993). Summary judgment is appropriate "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

### B. A Summary of Water Rights in Arizona.

¶ 15 We begin by observing that Arizona's "bifurcated system of allocating water rights differentiates groundwater users from surface water users." *Gila River IV*, 198 Ariz. at 334, ¶ 3, 9 P.3d at 1073. Surface water is defined as "[t]he waters of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, waste or surplus water, and of lakes, ponds and springs on the surface." Ariz.Rev.Stat. ("A.R.S.") § 45–141(A) (2003).[5] As might be supposed from the general nature of this definition, "[t]he boundary between surface water and ground-

water is not at all clear." *Gila River IV*, 198 Ariz. at 334, ¶ 4, 9 P.3d at 1073. "Subflow," which is considered surface water even though it is below ground, is water that "slowly find[s its] way through the sand and gravel constituting the bed of the stream, or the lands under or immediately adjacent to the stream." *Id.* (quoting *Maricopa County Mun. Water Conservation Dist. No. One v. Sw. Cotton Co.*, 39 Ariz. 65, 96, 4 P.2d 369, 380 (1931)). Subsurface water is presumed to be percolating groundwater and not subflow. *Id.* at 335, ¶ 6, 9 P.3d at 1074.

¶ 16 "[S]urface water is subject to the doctrines of prior appropriation and beneficial use." *Gila River IV*, 198 Ariz. at 334, ¶ 3, 9 P.3d at 1073; *see Tattersfield v. Putnam*, 45 Ariz. 156, 41 P.2d 228 (1935) (describing Arizona's early abandonment of riparian rights in favor of appropriative rights). Under those doctrines, one may acquire a right to put surface water to beneficial use, but any such appropriable right is subject to prior appropriated rights acquired by others. *See, e.g.*, A.R.S. §§ 45–151(A) (2003) (unappropriated water may be appropriated for domestic, municipal, irrigation or other uses; first to appropriate "shall have the better right"); –152 (2003) (anyone intending to acquire the right to beneficial use of water shall apply for permit to make appropriation); –153 (2003) (stating criteria for approval of applications).

¶ 17 On the other hand, the cases have held that percolating groundwater "is not appropriable and may be pumped by the overlying landowner, subject to the doctrine of reasonable use." *Gila River IV*, 198 Ariz. at 334, ¶ 3, 9 P.3d at 1073; *see also Jarvis v. State Land Dep't*, 106 Ariz. 506, 508, 479 P.2d 169, 171 (1970) (*"Jarvis II"*) (noting Arizona's rejection of "the doctrine of prior appropriation of ground waters" in favor of "the doctrine of reasonable use" (citing *Bristor*, 75 Ariz. 227, 255 P.2d 173)).[6] This

---

**4.** After final judgment was entered, Davis sold the CF Ranch to Chino Grande, L.L.C. ("Chino Grande"). On December 4, 2006, the superior court ordered that Chino Grande be joined as a party under Arizona Rule of Civil Procedure 25(d). We will refer to Chino Grande and Davis together as "Davis."

**5.** We cite the current versions of statutes throughout this Opinion because no revisions material to the Opinion have since occurred.

**6.** *Cf.* John D. Leshy and James Belanger, *Arizona Law Where Ground and Surface Water Meet*, 20 Ariz. St. L.J. 657 (1988) (arguing that because, inter alia, there often is a close hydrological link between groundwater and surface water, a "uni-

means that generally speaking, percolating groundwater may be pumped for the reasonable use of the land from which it is drawn. *Id.*

¶ 18 Under our common law, percolating groundwater may be pumped and transported to other property unless the withdrawal of the water injures the rights of "others whose lands overlie the common supply." *Id.* In *Neal v. Hunt,* 112 Ariz. 307, 541 P.2d 559 (1975), our supreme court recognized that transferring groundwater pumped from one property for use on another may "encourage the reasonable and beneficial use of this great natural resource." *Id.* at 313, 541 P.2d at 565. Thus, the court held that "in dealing with percolating waters and not surface waters or subterranean streams, and absent a showing of damage to, or impairment of, the water supply of another landowner within the same groundwater basin, a landowner may mine and remove, to an outside area, subjacent water from his land." *Id.*

¶ 19 Arizona's Groundwater Management Act (the "Act"), enacted in 1980, imposes certain restrictions on property owners' common-law groundwater rights. A.R.S. §§ 45–401 to –704 (2003 & Supp.2007). The Act delineates as "Active Management Areas" ("AMAs") several "geographical areas where groundwater supplies are imperiled." *Town of Chino Valley v. City of Prescott,* 131 Ariz. 78, 80 n., 638 P.2d 1324, 1326 n. (1981) ("*Chino Valley II* "). It imposes strict limits on the extraction and use of groundwater within the AMAs, *id.,* and also limits the pumping of water outside an AMA for use within an AMA, *e.g.,* A.R.S. § 45–551 (Supp.2007). The Big Chino sub-basin, in which the CF Ranch is situated, is not located within an AMA. *See* A.R.S. § 45–411 (2003).

¶ 20 Although surface water and groundwater are subject to different regulatory regimes, none of the conveyances at issue specifies whether the reservation of "commercial water rights" was intended to encompass surface water, groundwater or both. We note, however, that the market value of the reservation, at least according to the appraisal in the record, lies in the right to pump groundwater associated with the property. Moreover, the parties' briefs address the issue as if the reservation was limited to groundwater rights, and during oral argument, counsel for Appellants confirmed that Appellants make no claim based on appropriable rights.[7] For these reasons, in the analysis that follows, we will assume that the reservation applies only to percolating groundwater and not to surface water.

## C. Severing Water Rights from Land.

¶ 21 Davis's broadest attack on the water rights reservation, which the superior court adopted, is that Arizona law simply does not recognize "a water right severed from the land." Absent statute or regulation to the contrary, however, Arizona law generally permits the severance and transfer of water rights from the associated real property. *See W. Maricopa Combine, Inc. v. Ariz. Dep't of Water Res.,* 200 Ariz. 400, 407, ¶ 35, 26 P.3d 1171, 1178 (App.2001) ("Water rights can be bought and sold distinct from land.").

¶ 22 Properly speaking, a reservation of water rights cannot reserve an ownership interest in a source of water; instead, one may own, and reserve, only a right to use water. Thus, the owner of land overlying percolating groundwater has a right to the usufruct of the water. *Chino Valley II,* 131 Ariz. at 82, 638 P.2d at 1328.[8] This right (to use water associated with real property) is a property right. *Paloma Inv. Ltd. P'ship v. Jenkins,* 194 Ariz. 133, 138, ¶ 22, 978 P.2d 110, 115 (App.1998). Because the right is a hereditament, it must be conveyed by deed. *Neal,* 112 Ariz. at 310–11, 541 P.2d at 562–63.

tary management" legal construct should apply to both).

**7.** During oral argument, Davis's counsel asserted that Davis owns appropriable irrigation rights associated with the CF Ranch, but the record on appeal contains no evidence of any such rights.

**8.** "A usufruct is the right to use and enjoy the profits of property that belongs to another." *Paloma Inv. Ltd. P'ship v. Jenkins,* 194 Ariz. 133, 138 n. 1, ¶ 22, 978 P.2d 110, 115 n. 1 (App.1998).

¶ 23 Davis cites no authority, and we have found none, for the proposition that a right to use water, as an interest in real property, does not fall within the general common-law rule that "[a] grantor has the right to make a reservation of an interest in real property." *Phoenix Title & Trust Co. v. Smith*, 101 Ariz. 101, 106–07, 416 P.2d 425, 430–31 (1966) (recognizing several types of reservations, including water reservations); *see also Spurlock v. Santa Fe Pac. R.R. Co.*, 143 Ariz. 469, 478, 694 P.2d 299, 308 (App. 1984) (when parties to a deed, by way of a reservation, sever the subsurface estate from the surface estate, they create "two distinct, co-existing, and individually valuable estates").

¶ 24 The issue in *West Maricopa* was whether the owner of an appropriated water right needed the consent of the owners of a streambed to use the streambed to transport water. In holding that the appropriator did not require the consent of the streambed owners, this court emphasized the tremendous importance of water to this "arid desert." 200 Ariz. at 404, ¶ 14, 26 P.3d at 1175. Indeed, we said, "The essence of western water law is that water, not land, is the scarce resource." *Id.* at 407, ¶ 36, 26 P.3d at 1178. We observed that as a consequence, Arizona historically has recognized that rights in water can be separated from rights in associated real property: "Land can be bought and sold distinct from any water." *Id.* at 407, ¶ 35, 26 P.3d at 1178 (citing *Paloma*, 194 Ariz. at 138, 978 P.2d at 115). Moreover, we stated, "[W]hen a person acquires land he takes it subject to any water rights which might have been initiated according to the law." *Id.* at 408, ¶ 37, 26 P.3d at 1179 (quoting *England v. Hing*, 8 Ariz.App. 374, 378, 446 P.2d 480, 484 (1968), *vacated on other grounds*, 105 Ariz. 65, 459 P.2d 498 (1969)).

¶ 25 At issue in *Paloma* was a water rights agreement that this court characterized as giving W.K. Jenkins a right to "sell, lease or transfer the water or water rights of [a ranch]" and entitling him to a share of the net proceeds of any sale, lease or transfer of groundwater associated with the ranch. 194 Ariz. at 136, ¶ 7, 978 P.2d at 113. Paloma, which had purchased the ranch, sought a declaration that the water rights agreement was invalid and that the rights at issue remained with the ranch. *Id.* at 137, ¶ 18, 978 P.2d at 114. This court described the interest conveyed by the water rights agreement as a royalty interest—"the right to receive a share of the proceeds upon sale of the water." *Id.* at 138, ¶¶ 23–24, 978 P.2d at 115. We upheld the agreement, concluding that it had conveyed a real property interest that bound Paloma "as a successor owner of the land." *Id.* at ¶ 26.

¶ 26 Davis argues that *Paloma* does not apply because it "was about money, not water." But Davis misapprehends the lesson to be learned from *Paloma*, which is that a reservation of an interest in the proceeds of the commercial use of percolating groundwater is a grant of an interest in real property that can bind a subsequent owner. *Id.* at 136, ¶ 7, 978 P.2d at 113.

¶ 27 In *Neal*, the grantor reserved rights to groundwater associated with a ranch that he sold to another. 112 Ariz. at 309, 541 P.2d at 561. Specifically, "Neal reserved the water rights to the ranch ... except for enough water for the buyer to irrigate 40 acres of crops." *Id.* Our supreme court did not question the validity of the reservation agreement but only held that it was not binding on the eventual owner of the property because he was a "subsequent purchaser for valuable consideration without notice" of the agreement. *Id.* at 311, 541 P.2d at 563.

¶ 28 The rule recognized by *Neal* that a right to percolating groundwater is a hereditament and must be conveyed by a deed would be superfluous if groundwater rights could not be severed from the land. If that were the case, water rights would always (and only) transfer with the land, and there would be no need for a separate conveyance. Davis argues that the agreement in *Neal* "was not an attempt to sever a ground water right." The reservation at issue in *Neal*, however, was nearly identical to the reservation at issue here. There, as in this case, water rights were reserved by the grantor as he conveyed the associated real property to another.

¶ 29 Of course, all this is not to say that the Legislature lacks power to impose limits on an owner's right to sever water rights from the associated real property. *See generally Chino Valley II,* 131 Ariz. at 81, 638 P.2d at 1327 (upholding constitutionality of pumping restrictions imposed by 1980 Groundwater Act). Pursuant to A.R.S. § 45–472(A) (Supp.2007), a grandfathered irrigation right to withdraw and use groundwater in an AMA may be conveyed only with the land to which the right is appurtenant. However, Davis points to no such statute that applies to real property that, like the CF Ranch, lies outside an AMA.[9]

¶ 30 Nevertheless, Davis argues that "the right to percolating groundwater is a right associated with the overlying land to be exercised by the landowner." To the extent he means to say that groundwater cannot be pumped and transported for use on property apart from the overlying property, that argument is unfounded. As stated in *Neal,* "in dealing with percolating [groundwater] ..., absent a showing of damage to, or impairment of, the water supply of another landowner within the same groundwater basin, a landowner may mine and remove to an outside area, subjacent water from his land." 112 Ariz. at 313, 541 P.2d at 565. Along those lines, A.R.S. § 45–453 (2003) provides that "[i]n areas outside of [AMAs], a person may," except as provided in A.R.S. §§ 45–541 to –559, "[t]ransport groundwater." Davis cites no authority for the proposition that the power to exercise those groundwater rights may not be reserved by or conveyed to someone other than the owner of the associated real property.

¶ 31 Finally, Davis cites cases holding that appropriable surface water rights attach to the appurtenant land. Those cases, however, do not support his argument that rights to the percolating groundwater under the CF Ranch may not be severed.

## D. "Future" Water Rights.

¶ 32 Davis also argues that the reservation is invalid because it applies to "future water rights" and contends the superior court correctly determined that Arizona law does not recognize such rights. Appellants counter that Agua Sierra is not claiming a future right. Rather, they say, it claims an "existing, exclusive right to capture, market and transport water from the CF Ranch."

¶ 33 Davis's argument seems to be that one who is not currently exercising water rights has no right to exercise those rights in the future. Relying on *In re Rights to the Use of the Gila River,* 171 Ariz. 230, 830 P.2d 442 (1992) ("*Gila River I* "), the superior court agreed. We do not understand the language the superior court relied on from *Gila River I,* however, to bar the reservation at issue.

¶ 34 The long-running *Gila River* matter is an adjudication of appropriable rights in the Salt, Verde, Gila, Agua Fria, Upper Santa Cruz and San Pedro River watersheds. *Gila River I,* 171 Ariz. at 232, 830 P.2d at 444.[10] The issue in *Gila River I* was whether potential claimants were given sufficient notice of the adjudication proceedings. *Id.* As noted, although percolating groundwater is not subject to appropriation, subsurface water that is surface-stream subflow constitutes surface water and therefore is subject to appropriation. *See, e.g., Gila River IV,* 198 Ariz. at 333–34, ¶¶ 1–2, 9 P.3d at 1072–73. One of the critical issues to be addressed in the Gila River adjudication, therefore, is what subsurface water constitutes subflow and what is percolating groundwater. Accordingly, the summons issued in the case "instructed that all groundwater users should 'inform the

---

9. *Cf.* A.R.S. § 45–453 (2003) (outside of an AMA, "a person" may withdraw, use and/or transport groundwater pursuant to law).

10. In addition to *Gila River IV, supra* ¶ 13, other *Gila River* opinions are *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source,* 175 Ariz. 382, 857 P.2d 1236 (1993) ("*Gila River II* "); *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source,* 195 Ariz. 411, 989 P.2d 739 (1999) ("*Gila River III* "); *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source,* 201 Ariz. 307, 35 P.3d 68 (2001); *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source,* 212 Ariz. 64, 127 P.3d 882 (2006); and *In re the General Adjudication of All Rights to Use Water in the Gila River System and Source,* 217 Ariz. 276, 173 P.3d 440 (2007).

Court of their groundwater use ... to defend that use in the event that other claimants assert that the groundwater is either appropriable ... or subject to claims based upon federal law.'" *Gila River I,* 171 Ariz. at 238–39, 830 P.2d at 450–51.

¶ 35 The parties in that case who argued that "the notice was inadequate to inform 'owners of real property that [the] adjudication might adversely impact the right to develop and use such groundwaters at some future date'" pointed to the following language in the instructions for filing a statement of claimant form:

Should a claim be filed for some potential future use? No. Under the Arizona system of water law, water rights cannot be established or reserved for some potential future use. Water rights can only be established through proper legal appropriation and putting the water to actual beneficial use.

*Id.* at 239, 830 P.2d at 451.

¶ 36 Our supreme court concluded that "the instructions contain[ed] a correct statement of the law" because "[a]ppropriative water rights are based on current beneficial use, not reservation for future uses." *Id.* Thus, the court held that "real property owners claiming a right to use underground water at some future time would—absent present beneficial use or a claim based on federal law—have no *appropriative* claims to assert in the adjudication." *Id.* (emphasis in original).

¶ 37 The superior court erred by relying on these words from *Gila River I* to invalidate the reservation of groundwater rights in this case. As noted, we do not understand the reservation to encompass any appropriable water rights associated with the CF Ranch. At issue instead are rights to withdraw percolating groundwater. But percolating groundwater was not at issue in *Gila River I;* that case concerned appropriable rights. As we have seen, one need not acquire an appropriable right to pump percolat-

ing groundwater; instead, the right to pump groundwater is limited only by the doctrine of reasonable use, subject to the rights of the owners of other property overlying the groundwater, and in some locations, by statute. *See, e.g., Bristor,* 75 Ariz. at 234, 255 P.2d at 177 ("[P]rior right to the use of ground waters cannot now be acquired and never could have been acquired under the law of prior appropriation."); *Neal,* 112 Ariz. at 312, 541 P.2d at 564; A.R.S. §§ 45–451, –453. Because, as noted above, the record does not disclose that Agua Sierra is claiming appropriable water, the language in *Gila River I* is irrelevant to the validity of its commercial water rights reservation.[11]

¶ 38 Davis also cites some of the cases noted above for the proposition that the owner of a groundwater right may not transport water off the land if doing so damages the water supply of owners of other land overlying the groundwater. *See, e.g., Jarvis II; Jarvis v. State Land Dep't,* 104 Ariz. 527, 529, 456 P.2d 385, 387 (1969) ("*Jarvis I* "). To be sure, the rule that one may be subject to liability for damaging another property owner's underground water supply may limit the scope of the groundwater reservation at issue. But contrary to Davis's contention, the rule does not invalidate it.

**E. Rights Acquired Through Use.**

¶ 39 Davis next contends that the reservation is not valid because "[s]elling water is not a use that gives rise to a water right in Arizona." He also cites *Bristor* and A.R.S. §§ 45–141, –151, and –402, arguing that under those authorities, "[b]oth surface water and groundwater in Arizona must be put to a beneficial use" and that groundwater may not be transported free of restriction.

¶ 40 As noted above, ¶¶ 32–38, to the extent Davis is arguing that under Arizona common law one must be currently pumping percolating groundwater in order to maintain the right to do so in the future, he is incor-

---

**11.** Davis also cites *Gillespie Land & Irrigation Co. v. Buckeye Irr. Co.,* 75 Ariz. 377, 257 P.2d 393 (1953), for the proposition that "a water right is attached to the land on which it is beneficially used and becomes appurtenant thereto." *Id.* at

384, 257 P.2d at 397–98. But as with *Gila River II,* that case pertained to appropriable surface water, not percolating groundwater. *Id.* at 384, 257 P.2d at 397.

rect. As our supreme court stated in *Gila River IV*, although "[b]y statute, surface water is subject to the doctrines of prior appropriation and beneficial use," "[p]ercolating groundwater, on the other hand, is not appropriable and ... [is] subject to the doctrine of reasonable use." 198 Ariz. at 334, ¶ 3, 9 P.3d at 1073. As discussed above and contrary to Davis's assertion, the acquisition of a water right through the beneficial use of water is a concept associated with appropriable water and not percolating groundwater. *See* A.R.S. § 45–141(A) (surface waters "are subject to appropriation and beneficial use").[12]

██ ¶ 41 The authorities Davis cites do not support his contention that groundwater rights may be acquired only through a current beneficial use. Arizona Revised Statutes §§ 45–141 and –151 are appropriable surface-water statutes, while section 45–402 (Supp.2007) is a definitions statute that does not refer to beneficial use. Similarly not on point, *Bristor* stands for the principle that percolating groundwater is not subject to appropriation but instead is subject to the doctrine of reasonable use. And *Jarvis I*, *Jarvis II* and *Town of Chino Valley v. State Land Department*, 119 Ariz. 243, 580 P.2d 704 (1978), teach that percolating groundwater may be pumped and removed from the land, as long as the withdrawal does not damage other owners of the overlying property. We recognize that A.R.S. § 45–453 provides that in areas outside AMAs, "a person may ... use groundwater for reasonable and beneficial use." That one may use groundwater for a beneficial use, however, does not support the contention that groundwater rights must be acquired through a current beneficial use.

██ ¶ 42 In arguing that "[t]ransporting groundwater has never been something that a landowner, let alone a non-landowner, could do free of restrictions," Davis points to A.R.S. §§ 45–551 and –555, and contends those statutes do not "contemplate[ ] the right to set up a commercial business for extracting and transporting groundwater free of any ownership of land." Although the cited statutes impose restrictions on the transport of groundwater from one property to another, they do not forbid a grantor from reserving for itself the right to do just that. Pursuant to section 45–551 (2003), "groundwater that is withdrawn in a groundwater basin or sub-basin outside of an initial [AMA] may not be transported directly or indirectly to an initial [AMA]" unless specifically authorized by statute. Pursuant to section 45–555 (2003), a city or town owning land "consisting of historically irrigated acres in the Big Chino sub-basin ... or a city or town with the consent of the landowner, may withdraw from the land for transportation to an adjacent initial [AMA] an amount of groundwater determined pursuant to this section." [13] Although these provisions may limit (in some cases, perhaps significantly) the ability of an owner of a commercial groundwater right to exercise that right, they do not bear on ownership of the right and do not render the reservation at issue invalid.

### F. The Commercial Water Rights Reservation Is Valid.

¶ 43 For the foregoing reasons, we conclude that a grantor may reserve rights to the commercial use of percolating groundwater beneath land that the grantor no longer owns. This conclusion logically follows from the principles that one may sever and reserve rights to percolating groundwater from the land under which the groundwater lies, *e.g. Neal*, 112 Ariz. at 310, 541 P.2d at 562,

---

**12.** We note that *Arizona Public Service Co. v. Long*, 160 Ariz. 429, 773 P.2d 988 (1989), states that "[o]ne only has the right to put [water] to beneficial use" and "[t]his applies to both surface water ... and groundwater." *Id.* at 436, 773 P.2d at 995. This statement is quoted by the court in *Arizona Water Co. v. City of Bisbee*, 172 Ariz. 176, 179, 836 P.2d 389, 392 (App.1991). Because both cases deal with appropriable effluent water and not groundwater, the statements are *dicta* and have no precedential value to a

question of law relating to percolating groundwater. *See Deese v. State Farm Mut. Auto. Ins. Co.*, 172 Ariz. 504, 509, 838 P.2d 1265, 1270 (1992).

**13.** Historically irrigated acres are defined as "acres of land overlying an aquifer that were irrigated with groundwater at any time between January 1, 1975 and January 1, 1990." A.R.S. § 45–555(D)(3).

and may sell, lease or transfer water or water rights associated with land one no longer owns, *see Paloma*, 194 Ariz. at 138, 978 P.2d at 115. Accordingly, we hold that the commercial water rights reservation at issue is valid under Arizona water law.

 ¶ 44 In reaching this conclusion, we disagree with the superior court's declaration that "[a]llowing the [Appellants] to tie up the groundwater rights to the property until they decide to market the water is contrary to Arizona's policy regarding water rights." As this court stated in *West Maricopa*, "Arizona water law is aimed at maximum beneficial use of a scarce resource." 200 Ariz. at 406, ¶ 29, 26 P.3d at 1177. We are not persuaded that in order to accomplish this objective, commercial rights to groundwater necessarily must be held by the owner of the land situated above the water. To the contrary, as indicated by the appraisal of the water rights in the record in this case, when necessary and appropriate, market forces likely will promote the maximum use of the groundwater.

## CONCLUSION

¶ 45 For the foregoing reasons, we vacate the summary judgment and award of attorney's fees entered in Davis's favor.[14] We remand so the superior court may ascertain whether the commercial water rights subject to the reservation consist only of rights to percolating groundwater or also include appropriable surface-water rights. If the court determines that the reservation encompasses only percolating groundwater, the court is instructed to enter judgment in favor of Appellants and to consider an award of attorney's fees in their favor. Otherwise, if the court determines that the reservation also encompasses certain appropriable rights, the court is instructed to determine the validity of that portion of the reservation according to Arizona law and consistent with this decision.

CONCURRING: JON W. THOMPSON and SUSAN A. EHRLICH, Judges.

---

14. Because we vacate the judgment on the ground that the commercial water rights reservation is valid, we do not address Appellants' additional arguments for vacating the judgment, nor do we address Appellants' argument that the superior court improperly dismissed Agua Sierra's rescission claim.